Filed 9/16/25  P. v. Warren CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>NICOLE KRYSTAL WARREN,<br><br>    Defendant and Appellant. | D084087<br><br><br><br>(Super. Ct. No. SCD299435) |

APPEAL from an order of the Superior Court of San Diego County, Polly H. Shamoon, Judge.  Affirmed as modified.

Mytili G. Bala, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski and Flavio Nominati, Deputy Attorneys General, for Plaintiff and Respondent.

Nicole Krystal Warren appeals from an order of the superior court following a probation review hearing.  She asserts that at that hearing, the trial court, the Honorable Polly H. Shamoon presiding, improperly revoked a previous order by another superior court judge that had allowed the probation department to begin the paperwork under the Interstate Compact

for Adult Offender Supervision (Interstate Compact or Compact) to transfer Warren's probation to New York; and, that Judge Shamoon improperly took exclusive jurisdiction of the case going forward. In addition, Warren asks this court to order that the matter be reassigned under Code of Civil Procedure section 170.1. We conclude that the trial court exceeded its jurisdiction by revoking a prior order and that the order purporting to retain exclusive jurisdiction was a legal nullity, but decline to order reassignment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Underlying Crime and Plea Agreement

Warren's teenage daughter was involved in an altercation during a memorial service at a San Diego beach in June 2023. Upon learning of the altercation, Warren drove to the beach and confronted two individuals. Another altercation ensued, and Warren stabbed both individuals in the arm with a pocketknife. One of the victims suffered a serious injury that required surgery. The police contacted Warren and her daughter the next day. They were packing their car, possibly to leave town. The police searched the car and found a knife resembling the one used in the attack, and a firearm in the glove box.

The People charged Warren with two counts of assault with a deadly weapon, one for each victim, and one count of having a concealed weapon in a vehicle. On August 9, 2023, Warren pled guilty to one count of assault with a deadly weapon and admitted an allegation that she personally inflicted great bodily injury upon a person. Judge Shamoon accepted the plea. On the change of plea form, the parties noted that the court "indicates alternatives to custody." When taking the plea, the court noted that the parties had a "lengthy" discussion off the record, and that Warren was going to receive probation.

2

## B.     The Sentencing Hearing

The court held the sentencing hearing on September 27, 2023.  In a victim impact statement, the primary victim said that he had a good job before the incident but was now unsure of his future.

The People asked the court to sentence Warren to 365 days in custody.  They noted the trial court's prior discussion but asserted a term of custody was appropriate given the nature of the crime.  Defense counsel reminded the court that Warren was 38, had no prior criminal history, and that the court had previously acknowledged that there was a "maternal aspect" to the crime.  Defense counsel said that Warren was the sole provider for three children and had understood the court would sentence her to probation when she entered the plea because custodial time, or an alternative such as work furlough, would "take her away from her kids."

The trial court, Judge Shamoon presiding, sentenced Warren to two years formal probation.  The court said restitution would be set at a future hearing but noted that Warren would be "paying all the medical bills."  The court ordered payments of $150 per month and noted that victim restitution would be paid before any other fines and fees.  The court also required Warren to complete an eight-hour, in-person anger management course.  The court declined to require volunteer work, stating, "I think what's more important to the victims is that she works more and is able to pay them off. $150 is the minimum, but the medical bills are likely going to be in the thousands of dollars [and] I want her to be able to pay the restitution."  At counsel's request, the court clarified that restitution payments would start after the restitution hearing but noted that Warren knew it was coming and could "start saving for it."

The formal probation order states that all fines and restitution are to be paid at a rate of $150 per month, and that all payments are to be applied to victim restitution first. There is an asterisk adjacent to the dollar amount ($150) indicating that the fines and fees are "stayed pending [the] restitution hearing." The probation order also includes a term that requires Warren to obtain the court's and probation officer's "written consent before moving out of state."

### C. The Restitution Hearing and Related Proceedings

On November 16, 2023, the court, Judge Shamoon presiding, received documentation from the victim evidencing a restitution amount of $7,729.21. Warren's normal defense attorney was unavailable. Another public defender filled in and requested a hearing on the amount of the restitution. Judge Shamoon set a hearing for December 8, 2023, but noted that she had reviewed the information provided by the victim and that the burden would be on the defense to prove that any of the charges were unreasonable or not reasonably related to the conviction. On the minute order from the hearing, Judge Shamoon indicated a victim restitution amount of $7,729.31, and that a restitution hearing was set for December 8, 2023. The court subsequently continued the matter to January 10, at the People's request.

On January 10, 2024, the parties appeared before the Honorable Marian F. Gaston. The court conducted a *Marsden*[1] hearing. After the court denied Warren's request to relieve her counsel, Warren then accepted the previously stated restitution amount without a hearing. The trial court added $40 for parking that day and set the total at $7,769.21. Defense counsel asked if Warren could have 90 days to start making payments. The court agreed and asked, "how much per month?" Defense counsel said, "$50 a

---

[1]    See *People v. Marsden* (1970) 2 Cal.3d 118, 124−125.

4

month would be good," and the court set payments at $50 per month, to begin on April 15, 2024. Neither defense counsel nor the prosecutor informed Judge Gaston that Judge Shamoon previously had issued orders as to both the monthly amount of restitution payments and the start date for such payments.

### D. Warren's Request to Start the Interstate Compact Process

On February 27, 2024, the parties appeared before the Honorable John G. Pro for a very brief hearing. Defense counsel said that Warren was doing well on probation and wanted to move back to her home state of New York. Counsel asked that "the paperwork reflect that the interstate compact process can begin so that probation can contact New York." The court confirmed that there was no objection from the district attorney or the probation department, and "note[d] for the record that [Warren's] interstate compact process is to begin, and that's to the state of New York." There was no further discussion on the matter. The minute order for the hearing stated, "court will note that this Defendant's interstate compact paperwork to New York is authorized to begin through Probation."

### E. Hearing on March 26, 2024

On March 26, 2024, the case returned to Judge Shamoon for a probation review hearing. Judge Shamoon began by noting she was "very concerned about information that was gathered post-plea in this case." She explained, "one of the things that was discussed during the negotiations is restitution for a young man [the victim of Warren's assault] who was headed to college who had serious injuries, and a mom who had to then care for him and the financial implications for the family. Despite the fact that this court wanted to order that Warren go to work furlough, she had indicated to the court, through her lawyer, that she had some issues with kids at home, could

5

not do work furlough, wanted to pay the maximum amount of money that she could to make the victim whole, and we went on from there."

Judge Shamoon went on to explain that she set restitution at $7,729.31 in September, and "Warren then thought upon herself to contest that. It went to an evidentiary hearing." She said that Warren "circumvented this court's order and the order I made and asked that judge to reduce the fines to $50 from $150, and they would not start until April 15th. Despite the fact that this order was made on November 16th, we learned today, for the first time ever after I set this hearing, that Warren has made one single $150 payment." The court also noted that Warren only provided proof of her anger management class just before the hearing, despite previous requests from probation. Judge Shamoon concluded, "And on top of everything I've indicated, Ms. Warren then goes to Probation to ask for an Interstate Compact to New York."

Defense counsel explained that Judge Shamoon had not previously set a date for restitution payments to begin, and that Warren was within her rights to request a hearing on the amount. Defense counsel noted that the case was sent to Judge Gaston for that hearing, and Judge Gaston ordered that the payments begin on April 15, 2024. However, Warren made a payment of $150 before April 15. Counsel represented that Warren had no issue paying restitution and understood it would be $150 per month.

Judge Shamoon responded, "The whole plea in this case was so Warren could start paying right away. That's why she didn't go into custody, and that's why she didn't get work furlough, because she needed to maximize the money that she was going to pay this victim." In Judge Shamoon's view, Warren "went and got more time and circumvented a plea. Because if this Court knew that she wasn't going to pay until April . . . I never would have

6

agreed to this." Defense counsel represented that Warren could make payments of $200 per month.

The court then stated, "There will be no Interstate Compact. As I indicated, probation is very concerned about that too, despite the fact that she's made requests. When I questioned her daughter, there's no ties to New York; how they would get there; when they would get there; where they would live. But she's going to pay a significant amount of restitution before she leaves the State of California." The probation officer clarified the probation department's only concern was that Warren had not provided an address in New York, which was necessary to move forward.

Judge Shamoon stated, "I am revoking the ability she has to move to New York through Interstate Compact. I'm revoking that." She explained that she remained concerned that Warren was going to evade paying the restitution, and said, "if she has money to move to New York, she should pay more victim restitution." She continued, "she's not allowed to leave the State of California without this court's approval of that. Her payments are $200 a month beginning April 1st, and we will have a review hearing in May to make sure she's complied with that."

Finally, Judge Shamoon stated, "there's a background on this case that seems to be piecemealed with the other people that she goes through. So I'm going to take personal jurisdiction of this case. All matters will come to this department."

At the follow-up hearing in May, Judge Shamoon confirmed that Warren had made two more payments of $200 each, and that she was otherwise in compliance with her probation. Judge Shamoon addressed Warren directly and stated, "as long as you keep up with the payments, it doesn't appear that you need to come to court again, and once a substantial

7

amount of restitution has been paid at that time, if you're going to make another request to move, I'll entertain it at that time."

## II.    DISCUSSION

Warren appeals from the trial court's March 26, 2024 orders. She asserts Judge Shamoon acted in excess of the trial court's jurisdiction, or in the alternative, abused her discretion, when she revoked the prior order allowing the Interstate Compact paperwork to begin. In addition, Warren asserts the order taking jurisdiction of the case and requiring that all future hearings be set in Judge Shamoon's department is a legal nullity, and that the case should be reassigned to another judge.

### A.    The Interstate Compact Order

We begin with Judge Shamoon's order "revoking" Judge Pro's prior order allowing the Interstate Compact paperwork to begin through the probation department.

The Interstate Compact is an " 'agreement between member states [including California] that seeks to promote public safety by systematically controlling the interstate movement of certain adult offenders.' " (*Wofford v. Superior Court* (2014) 230 Cal.App.4th 1023, 1029 (*Wofford*).) "The Compact is overseen by the Interstate Commission for Adult Offender Supervision [the Commission], which is a 'quasi-governmental administrative body vested by the states with broad regulatory authority.' " (*Ibid*.) "The Commission promulgates rules that 'have the force and effect of statutory law' and that take precedence over any conflicting laws established in the compacting states." (*Ibid*.) The Commission also issues advisory opinions and a judicial bench book (the Bench Book).[2] (*Wofford,* at p. 1029.)

_____

[2]    (Bench Book,<https://interstatecompact.org/bench-book> [as of Sept. 16, 2025], archived at https://perma.cc/U9GQ-5DAC>.)

8

According to the Bench Book, a "supervised individual does not have a constitutional right to transfer their supervision to another state, even if otherwise eligible." (Bench Book § 3.2.1.2., p. 33.) The Interstate Compact "imposes an obligation on the receiving state to accept the individual for supervision once the sending state has decided to transfer supervision," but it does not create "any constitutionally protected right for a supervised individual to relocate." (*Ibid.*) "The sending state's decision to deny a transfer of supervision is final and is entitled to judicial deference." (*Ibid.*)

If a sending state does decide to transfer supervision of an individual, the receiving state must accept the transfer if certain criteria are met, including that the individual is "in substantial compliance" with a "valid plan of supervision." (Bench Book § 3.2.1.2., p. 33.) "Substantial Compliance means that a supervised individual is sufficiently in compliance with the terms and conditions of his or her supervision so as not to result in initiation of revocation of supervision proceedings by the sending state." (*Id.* at § 3.1, p. 31.) When a sending state makes a transfer request, "the receiving state has up to 45 days to investigate and respond." (*Id.* at § 3.3.1., p. 39.)

Here, as is often the case, the formal probation order specifies that Warren must obtain the court's and the probation officer's written consent before moving out of state. Thus, in order to move to New York, Warren had to be eligible and accepted by New York under the Interstate Compact, *and* had to have the written consent of the court. Notably, here, Judge Pro never gave Warren the court's written consent *to move out of state*. He simply "noted" that Warren's Interstate Compact "paperwork to New York is authorized to begin through probation."

At oral argument, this court asked the parties to address the practical implications of Judge Shamoon's order purporting to revoke Judge Pro's prior

9

order, and specifically, whether Judge Pro's order that the Interstate Compact process could begin amounted to written consent for Warren to move out of state, as required by the formal probation order. Warren's counsel asserted that Judge Pro's order authorizing the process to begin did equate to authorization for Warren to move out of state because once the process begins, it is up to the probation officers and Compact office to determine eligibility for the move without further involvement of the court. Warren's counsel conceded that, had the issue come before Judge Shamoon in the first instance, Judge Shamoon could have declined to allow the Interstate Compact process to begin, but asserted that once Judge Pro allowed the process to *begin*, "it was out of the court's hands." The People did not argue otherwise but asserted that there needs to be "some form of safety valve" when the process reveals an issue with the requested move.

We note that there is minimal legal authority addressing the issue of whether a term of probation requiring the court's written consent to an out-of-state move would be satisfied by a court order that merely authorizes the Interstate Compact paperwork process to begin. Warren's counsel points to *Wofford*, but the court there addressed the scope of the Interstate Compact, not a term of probation requiring the court's written consent to an out-of-state move. The defendant in *Wofford* was on mandatory supervision, not probation, and the issue was whether the trial court erred by denying her request to apply for an Interstate Compact transfer "based on its conclusion that offenders serving mandatory supervision sentences are ineligible" under the Interstate Compact. (*Wofford, supra,* 230 Cal.App.4th at p. 1027.)

In concluding that that defendants on mandatory supervision may be eligible for transfer under the Interstate Compact, and that such transfers do not necessarily run afoul of the goals of mandatory supervision, the court

10

noted that "a supervised offender's request for out-of-state transfer is *fully within the discretion* of the relevant California authorities." (*Wofford, supra,* 230 Cal.App.4th at p. 1036.) It explained: "First, based on the mandatory supervision condition requiring court and probation officer consent to an out-of-state move, the superior court serves as a gatekeeper with discretion to decline permission to pursue a transfer request with the Compact office. Thus, Compact eligibility does not lessen the trial court's discretionary power to keep an offender within the state because without the court's approval there can be no transfer. Second, the Compact office can decline the transfer request even if the court and probation officer consented." (*Ibid*.) The court noted further, "the Commission also requires that the offender's supervising agent (i.e., probation officer) first decide if the transfer plan is viable, and if the decision is no, the application is not submitted to the Compact office." (*Id*. at p. 1036, fn. 10.)

Warren relies on this language to assert that the trial court serves only as a "gatekeeper" to the Interstate Compact process, and that once the trial court allows the process to begin, the rest is up to the probation officer and Compact administrators. Thus, the trial court's consent to begin the process is equivalent to consent for the defendant to move out of state. But the *Wofford* court did not consider or affirmatively address that question or, more specifically, what, if any, role the court plays in providing (or withdrawing) its consent to the move itself, as opposed to its consent to allow the Interstate Compact to begin. Rather, the court in *Wofford* addressed whether the defendant was eligible for an Interstate Compact transfer in the first instance, and also noted, "Compact eligibility does not lessen the trial court's discretionary power to keep an offender within the state because without the court's approval there can be no transfer." (*Wofford, supra,* 230 Cal.App.4th

11

at p. 1036.)  Here, there was a term in Warren's probation order, *separate* from the Interstate Compact rules and procedures, that required the trial court's written consent to any out-of-state move.

Warren also relies on the San Diego County Probation Department, Field Services Procedure Manual,[3] but it is no more helpful in resolving the question at hand.  As Warren's counsel conceded at oral argument, the manual is not legal authority.  The purpose of the manual is to explain the Interstate Compact process to probation officers; it does *not* define the trial court's role or authority as it pertains to a formal condition of probation that expressly requires the trial court's written consent to any out-of-state move. Warren's counsel noted further that there is no provision in the Bench Book or the Interstate Compact rules by which the court is able or required to provide a final authorization for the move.  But likewise, the Bench Book and the associated Interstate Compact rules are geared towards the Interstate Compact process, *not* the impact of a separate provision in a defendant's formal probation order that requires trial court to give *written consent* to any out-of-state move.  (See, e.g., Bench Book, § 3.8.1, p. 49 ["the ICAOS governs the movement of offenders and not the terms and conditions of sentencing"].)

The Interstate Compact process, and associated paperwork, are certainly necessary to ensure the sending and receiving state are in agreement before any such move can take place, but we are not willing to rely on a bench guide or a probation manual to decide whether the authorization to *begin* the paperwork equates to the trial court giving written consent to the move itself, as required by the formal probation order.

---

[3]    (San Diego County Probation Department, Field Services Procedure Manual, Procedure 408, §§ 408.1–408.3, <https://www.sandiegocounty.gov/ content/sdc/probation/Probation_Policies.html> [as of Sept. 16, 2025], archived at <https://perma.cc/JXM2-9265>.)

But we need not, and expressly do not, decide that precise issue here. Warren asserts Judge Shamoon acted in excess of the trial court's jurisdiction by "revoking" Judge Pro's order permitting the Interstate Compact process *to begin*. At the March 26 hearing, the probation officer noted that Warren had not provided an address and that, "we have to provide an address to get the process going." Thus, it appears the process had not actually begun, and that the practical effect of Judge Shamoon's order was to pause the process until such time as the court was willing to consent to the transfer. By doing so, Judge Shamoon did technically "revoke" Judge Pro's prior order, which, at a minimum, permitted the Interstate Compact process to begin. We agree that Judge Shamoon did not have the jurisdictional authority to do so. (See, e.g., *Ford v. Superior Court* (1986) 188 Cal.App.3d 737, 741–742 [" 'it is beyond the jurisdictional authority of another department of the same court to interfere with the exercise of the power of the department to which the proceeding has been so assigned' "].)

The People assert that Judge Shamoon did not revoke Judge Pro's order and was instead reporting on probation's findings. The record does not support that contention. As noted, the probation officer said that Warren had not provided an address in New York, and that the process could not *begin* until she did. Probation did not determine that Warren did not qualify for a move under the Interstate Compact; they simply noted that they would need an address before they could proceed with the process that Judge Pro had authorized.

The People assert further that Judge Shamoon had highly persuasive reasons to reconsider Judge Pro's order—namely, Warren's eligibility for transfer—but this argument fails for the same reasons. The probation department had not begun the process, and it follows that they had not

13

determined whether Warren met the eligibility criteria for the move. Putting aside the question of whether the trial court could ultimately withhold consent to the move, even if it were approved through the Interstate Compact process, Judge Shamoon's order stopped the Interstate Compact process itself, in contradiction to Judge Pro's prior order that it could begin. At a minimum, proceeding with the Interstate Compact process in the meantime may have allowed for a faster move if and when the trial court did provide its consent.

For these reasons, we conclude the trial court's March 26, 2024, order purporting to revoke the court's prior consent for the Interstate Compact process to begin must be vacated

## B.    The Jurisdiction Order

Warren next contends the trial court's order "tak[ing] jurisdiction regarding this case," and requiring that "all future hearings [be set] in department 1102" (Judge Shamoon's department) was a legal nullity and must be stricken. We agree.

*People v. Osslo* (1958) 50 Cal.2d 75 is instructive. There, our high court explained:

> "It does not appear that the trial judge had power to impose the following terms in his probation orders: 'that this Court and Judge shall retain jurisdiction of this matter throughout the said period of probation and no other department of the Court or other Judge shall modify this order without notice to the Judge who tried the case.' An individual judge (as distinguished from a court) is not empowered to retain jurisdiction of a cause. The cause is before the court, not the individual judge of that court, and the jurisdiction which the judge exercises is the jurisdiction of the court, not of the judge. Rules of court which provide that post-trial proceedings in a cause shall be heard by the judge who tried the matter are entirely proper, but the

14

individual judge cannot order that such proceedings must be heard by him." (*Id.* at p. 104.)

The People point to certain rules that permit *a court* to maintain jurisdiction to modify restitution or enforce a plea bargain, and that require, to the extent possible, that a restitution order be prepared by the sentencing court. (See *People v. McCune* (2022) 81 Cal.App.5th 648, 652−653; *People v. Collins* (1996) 45 Cal.App.4th 849, 863; Penal Code § 1202.4, subd. (f)(3).) Warren does not dispute these authorities, and neither do we. However, as Warren points out, they do not give a particular judge the authority to retain jurisdiction over *all future proceedings*.

For these reasons, we conclude the trial court's order purporting to maintain exclusive jurisdiction over all future proceedings must be stricken.

## C.      Reassignment

As a final matter, Warren asserts that based on Judge Shamoon's actions and comments on the record, we should reassign the matter to another judge under Code of Civil Procedure section 170.1, subdivision (c), which provides: "At the request of a party or on its own motion an appellate court shall consider whether in the interests of justice it should direct that further proceedings be heard before a trial judge other than the judge whose judgment or order was reviewed by the appellate court."

"An appellate court must exercise its power to disqualify a judge under that statute sparingly, and only when the interests of justice require it." (*People v. LeBlanc* (2015) 238 Cal.App.4th 1059, 1079 (*LeBlanc*).) "The court may order disqualification when necessary to dispel the appearance of bias, for example, when the record shows the trial judge became embroiled or personally invested in the outcome of the proceedings." (*Ibid.*) "Proper grounds for disqualification under Code of Civil Procedure section 170.1, subdivision (c), 'include "where a reasonable person might doubt whether the

15

trial judge was impartial [citation], or where the court's rulings suggest the 'whimsical disregard' of a statutory scheme.' ' " (*LeBlanc,* at p. 1079.) "Mere judicial error does not establish bias and normally is not a proper ground for disqualification." (*Ibid*.)

Here, Warren asserts that Judge Shamoon's statements at the March 26, 2024 hearing, along with her improper assertion of exclusive jurisdiction, suggest that she had an undue personal stake in the case.

As discussed, while Warren was not legally required to start making payments until April under Judge Gaston's January order, Judge Shamoon had suggested, from the start, that Warren would pay at a rate of $150 per month, and that Warren was aware of her obligations and could start saving while awaiting a decision as to the amount of the final restitution award. There is also no dispute that she had paid only a small fraction of the victim restitution at the time of the March 26, 2024, hearing.

Judge Shamoon did acknowledge counsel's assertion that payments were not due until April 15, but also reiterated the importance the court placed on restitution, including when making its sentencing order, which included restitution as a formal term of probation, and expressed frustration at Warren's subsequent requests to reduce the payment amount and extend the time to start payments. Judge Shamoon also expressed concerns as to whether Warren's self-employment was sufficient to allow her to pay restitution in a timely manner given that the court had agreed not to impose custody time or work furlough so that Warren could "maximize the money that she was going to pay this victim."

Although we agree that Judge Shamoon exceeded the court's jurisdiction when she revoked Judge Pro's order, and that her purported attempt to maintain exclusive jurisdiction over the matter was a legal nullity,

16

we do not find that her comments on the record went so far as to demonstrate that she was improperly "embroiled or personally invested in the outcome of the proceedings." (*LeBlanc, supra,* 238 Cal.App.4th at p. 1079; see also *In re Wagner* (2005) 127 Cal.App.4th 138, 147 [record demonstrated "precipitous order remanding petitioner to custody, without affording him an opportunity to respond to the charges . . . was motivated by anger"].) Rather, Judge Shamoon was interested in ensuring that neither the trial court nor the parties lost sight of the key components of the negotiated plea bargain in this unique case. (See *Hernandez v. Superior Court* (2003) 112 Cal.App.4th 285, 303 ["The trial court's orders . . . do not suggest bias or whimsy on behalf of the court, only frustration and a desire to manage a complex case"].)

## III. DISPOSITION

The portions of the trial court's order of March 26, 2024, that (1) purported to take jurisdiction of the case, and (2) revoked the Interstate Compact authorization are stricken.

KELETY, J.

WE CONCUR:

McCONNELL, P. J.

BUCHANAN, J.

17